# Estate of Charles Bryant, deceased. Appeal of Susan J. Dean.

Argued March 30, 1896. Appeal, No. 119, Jan. T., 1896, by Susan J. Dean from decree of O. C. Phila. Co., July T., 1894, No. 182, dismissing exceptions to report of auditing judge, awarding estate to English claimants. Before STERRETT, C. J., McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Decree of distribution affirmed on findings of fact of auditing judge.

The portion of the opinion of the auditing judge, ASHMAN, J., relating to this claim was as follows:

The story told by the Maine claimant had in it something of dramatic interest. On July 16, 1852, Susan J. Calamer was married to one Levi F. Dean, at Lincolnville, Me. The husband was about twenty-nine years of age, and had been reared in the family of Thomas Gilkey, who lived at Islesboro, three or four miles from Lincolnville. At the time of his marriage, Dean was mate of the bark M. E. Trout, which was owned by the bride's father, and he continued to sail in her until 1861. He spent the spring and summer of 1861 at home and left in November. In that month his wife received a letter from him

dated at New York, and stating that he was about to sail from that port in the ship Harpswell. She never heard from him afterwards, and it was rumored and generally believed that the vessel was lost at sea and that Dean had perished. In 1873 Mrs. Dean remarried. She came to the audit and recognized the portraits found among the decedent's effects as correct likenesses of her first husband. Her claim rested mainly upon the testimony of a Captain Trim, a person who had known Dean as far back as 1843, when both of them lived at Islesboro, and who, in 1861, had secured for Dean a berth as mate on the Harpswell. Trim had never credited the current belief that the Harpswell had foundered, for the very excellent reason that the second mate of of the ship assured him that the vessel had arrived safely at Liverpool and that Dean had left her at that place. Ten years afterwards he met the fugitive in Philadelphia, and he then learned that Dean had taken the name of Charles Bryant. This fact came to his knowledge in a peculiar way. A seaman named Warren, who had been a neighbor and intimate of Trim, had shipped in 1865 on a schooner of which a certain Charles Bryant was mate. On the voyage Bryant, finding that the sailor came from Maine, voluntarily told him that he himself had been brought up when a boy, at Islesboro, in that State, by Thomas Gilkey. The sailor on returning home repeated this conversation to the father of Captain Trim, and was told by the latter that Gilkey had raised a boy named Dean, but had never had charge of one named Bryant ; and Warren was thereby convinced that Bryant was the original Dean under an assumed name. In 1871 he encountered Dean, alias Bryant, in a ship broker's office in Philadelphia, and he hastened to inform Captain Trim; who was then in the city, of the circumstances. Trim and he repaired to the broker's rooms, and Dean admitted to Trim that he had adopted the name of Charles Bryant. In his testimony Trim went on to say that he frequently saw Dean after that interview, particularly between 1887 and 1893, and he knew that Dean, under the name of Bryant, had a store at Third and Carpenter streets, and lived at the Delaware House. One other witness, named Bullock, was called to corroborate Trim. He was a native of Lincolnville, Me., and he identified the pictures of the decedent as likenesses of Dean, and declared that he had seen the original of the pictures in 1886 or 1887, on board Captain

Trim's vessel at Philadelphia, and had addressed him as Levi. The answer to this salutation was given by the witness on direct and cross-examination, in eight different shapes, but its purport was to "keep still." The witness had been mate along with Dean in a schooner, in 1850, but had only seen him three times after that year; in 1856, casually in Boston; in 1865, at New Orleans, and in 1886, in Philadelphia. His interview at New Orleans was brief. He hailed Dean on the street and said: "I heard you were dead,"and the supposed corpse replied: "I am not dead yet," and passed on. This, in a word, was the claimant's case, and although it comprehended a number of wearisome details, its point was the identification by Trim of the decedent as the missing husband of Mrs. Dean. The testimony invited scrutiny. It is remarkable that these witnesses, who are eager to prove the continued existence of Dean in the person of Bryant, now that a sum of money is at stake, should have so long and carefully concealed their knowledge of the fact from those to whom the information would be of supreme importance. This criticism is especially applicable to the witness Trim. He was the cousin and intimate associate of Dean, and he admitted that his mother and Dean's father had been raised in the same household. He had been told in 1862, and believed the statement, that Dean had landed safely at Liverpool, and he afterwards knew, so he swore, Dean's place of abode in Philadelphia; and yet he never communicated these facts to the wife or relatives of the missing man, who were mourning his death, and he even permitted the woman, who believed herself a widow, to contract a void marriage on the strength of that belief. When questioned as to the reason for his silence, he answered with the utmost nonchalance that it was no part of his duty to give the information. Subsequently he found it convenient to be more specific, and he said first, that Bryant was a Mason and pledged him as a brother Mason to secrecy, and next, that Bryant had been in prison and, therefore, had adopted an alias. This point is left without attempting to draw from it any inference as to the veracity of the witness. The testimony of Trim and his cowitnesses may be absolutely true in all that related to Dean. It may be true, and no doubt is, that a man of that name disappeared from his home in 1861; that he afterwards turned up elsewhere as Bryant,

and admitted his identity with Dean; that he had been in prison and had sought to hide his disgrace by assuming an alias; and it may also be true that in person and age he resembled the present decedent; and yet it may not be true—and it is certain that these facts combined do not show it—that the fictitious Bryant was one and the same with the Charles Bryant whose estate is being battled for.    Any man who happened to know the facts which have been detailed as to Dean's history, and who also knew the fact that this decedent, of unknown antecedents and without any known kindred, had died in Philadelphia, would at once see, no matter how dull might be his intellect, that the one link which was wanting to bring the heirs of Dean into touch with the decedent, was to identify the latter with the missing man; and Trim supplied that link when he declared that the husband of the claimant was the man who kept a store on Third street and who died at the Delaware House.    His statement on this point—the all-important one in the case—was as meager as could well be imagined.    He said at first that he had never been inside of decedent's store, and afterwards that he had been in it once or twice, but he could not describe it; he was never in the hotel while Dean lived there; he never saw decedent's wife, although it was proved that she ran the store; he never saw the decedent's daughter; and he was never at the decedent's residence.    The two bold facts which he affirmed to, and beyond which he would not venture, were that he saw the decedent sitting at the door of the grocery and in front of the hotel, and that he knew him to be Dean.    Did the rest of his narrative coincide with that of other witnesses whose opportunities for tracing the movements of the decedent must have been greater than his own?    In 1852, when Dean was married and served on the schooner Trout, sailing from New York and eastern ports, Captain Bryant was mate of the bark Isaac R. Davis, which sailed out of Philadelphia.    He had served on this boat since 1848, and previously to that service he was, in 1846, at the Sailors' Home in Philadelphia; while in 1845 or 1846 to January, 1848, Trim declared that Dean was in the U. S. navy.    In 1857, when, according to Trim, Dean had his home in Lincolnville, Maine, and was mate or captain of the M. E. Trout, Captain Bryant resided in Christian street, in this city.    In 1859, when Dean was still on board the

Trout, Bryant was officer under Captain Roberts of the Cordelia, which was owned by Starr & Co., of Camden, N. J., and he remained in the employ of that firm until 1864. As early as 1856 he had his home on Christian street, in 1861 on Third street, and after his wife's death, in 1878, at the Delaware House. During every year, beginning with 1855, his name and residence appear in the directories of this city. If in that long period it was possible for him to have lived a dual life, it is morally certain, if the claimant's own witnesses can be believed, that Levi Dean was not his double.

The auditing judge would suppress nothing in the evidence, however trifling, and he, therefore, notices the declaration of a stepson of the decedent, that the latter once told the witness that he came from Islesboro, Maine. The witness was a lad at the time of this conversation, and he was forty-seven years old when he repeated it. The decedent had told others that he came from other parts of New England, and the other stepson always believed that his stepfather was an Englishman or an Irishman. The claim of Mrs. Dean is rejected.

The other facts sufficiently appear in Bryant's Est., ante, p. 309.

*Error assigned*, among others, was not awarding balance for distribution to the appellant.

*Henry J. Scott*, with him *Robert J. Williams*, for appellant.

*William W. Ker*, for appellee.

OPINION BY MR. JUSTICE MITCHELL, July 15, 1896:

This appeal is dismissed upon the opinion of the auditing judge in the court below.

Appeal dismissed with costs.